```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------------x

 3    RAYMOND KESSLER, HARTENCE HILL,
      LAZARO RODRIGUEZ, TERESA HERENDEEN
 4    and BARBARA ABREU, Individually and on
      behalf of all others similarly situated,
 5
                    Plaintiffs,
 6
                 v.                              24 CV 526(KMK)
 7
                                                    DECISION
 8
      THE QUAKER OATS COMPANY,
 9
                    Defendant.
10
      ------------------------------------x
11

12

13
                                        United States Courthouse
14                                      White Plains, N.Y.
                                        March 12, 2025
15

16

17

18
      Before:  THE HONORABLE KENNETH M. KARAS, District Judge
19

20

21

22

23

24

25
```

1                              APPEARANCES

2


3    SULTZER & LIPARI, PLLC
          Attorneys for Plaintiffs
4    JASON P. SULTZER
     JEREMY FRANCIS

5


6    PAULIN, WILLEY, ANASTAPOULO
          Attorneys for Plaintiffs
7    PAUL DOOLITTLE

8


9    LEVIN, SEDRAN & BERMAN, LLP
          Attorneys for Plaintiffs
     CHARLES E. SCHAFFER

10


11   GOLDENBERG, SCHNEIDER, L.P.A.
          Attorneys for Plaintiffs
12   JEFFREY S. GOLDENBERG

13


14   LEEDS BROWN LAW, P.C.
          Attorneys for plaintiffs
     JEFFREY K. BROWN

15


16   HOGAN LOVELLS US, LLP
          Attorneys for Defendant
17   LAUREN S. COLTON
     BENJAMIN ANDREW FLEMING
18   MARC MARINACCIO

19

20

21

22

23

24

25


                   CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
                              (914)390-4103

```
1              THE COURT:  Good morning.

2              THE DEPUTY CLERK:  Good morning, Judge.

3              This is Kessler v. The Quaker Oats Company, 24 CV

4    526.

5              Counsel for plaintiff, please state your appearances.

6              MR. SULTZER:  Good morning, your Honor.  Jacob

7    Sultzer.  I'll be taking the lead for the plaintiffs today.

8              MR. SCHAFFER:  Good morning, your Honor.  Charles

9    Schaffer.  I'm also with plaintiffs.

10             MR. GOLDENBERG:  Good morning, your Honor.  Jeff

11   Goldenberg, also for the plaintiffs.

12             THE DEPUTY CLERK:  And for defendants.

13             MS. COLTON:  Good morning, your Honor.  Lauren

14   Colton, Marc Marinaccio and Ben Fleming from Hogan Lovells on

15   behalf of the defendants.

16             THE DEPUTY CLERK:  Do we have one more attorney for

17   Kessler?

18             MR. FRANCIS:  I think we have several.  This is

19   Jeremy Francis for plaintiffs.

20             Good morning, your Honor.

21             MR. BROWN:  Jeff Brown for plaintiffs.

22             Good morning.

23             MR. DOOLITTLE:  Paul Doolittle as well.

24             Good morning, your Honor.

25             THE DEPUTY CLERK:  Thank you.
```

1          THE COURT:  All right.  Good morning again,

2   everybody.

3          So we're gathered here to consider the application

4   for the preliminary approval of the class settlement.  I have

5   read the papers, but I don't want to deny anyone the glory of

6   supplementing them however you would like.

7          So I don't know who's going to speak, Mr. Sultzer, if

8   you're going to take the lead on this or who is going to speak

9   on behalf of the application.

10         MR. SULTZER:  Yes, your Honor, I was going to take

11  the lead on it.  If you want, I could give you a quick

12  three-minute summary that might answer all your questions and

13  streamline this a bit.

14         THE COURT:  Sure.  Go ahead.

15         MR. SULTZER:  Okay.  So, your Honor, as you know, the

16  threshold for preliminary approval is low and basically we just

17  need to see if the proposed settlement appears to fall within

18  the range of possible approval that the Court should order that

19  class members receive notice of the settlement.

20         So a couple of things that I look at right off the

21  bat is what is the range of reasonableness of the settlement

22  and, here, we both have significant monetary and nonmonetary

23  relief.  So, as your Honor knows, we have a $6.75 million

24  common fund with an additional $100,000 that's going to go

25  towards notice costs.  And the lawsuit also serves as a

1    catalyst regarding additional safety in food programs to detect

2    bacterial contamination and also the closure of the plant that

3    manufactured the recalled products.

4          What's also important, your Honor, too, is that the

5    settlement is a significant expansion of the recall because the

6    recall that Quaker Oats conducted was basically in the form of

7    coupons and required a proof of purchase and, here, class

8    members would get back cash in their pocket in at least a

9    couple products without the proof of purchase.

10         Of importance, your Honor, the amount here of the

11   settlement represents approximately about 25 percent of the

12   total sales of products that we estimate that made its way into

13   the consumers' homes and which were contaminated, which places

14   this settlement squarely in the range of another settlement

15   that we did before your Honor, the Lyons Magnus bacterial

16   contamination settlement that ultimately your Honor granted

17   final approval for.

18         The settlement, your Honor, was also conducted at an

19   arm's length transaction.  It took weeks to resolve the matter.

20   We did it before Judge Gandhi out of JAMS, who was a former

21   magistrate for many years in the Central District of

22   California.  And I think all of that demonstrates that the

23   settlement is fair, reasonable and adequate and we're

24   requesting that your Honor grant preliminary approval.

25         THE COURT:  Okay.  So I think you did touch on the

1    one question I had.  In terms of the range of reasonableness,

2    the way that factor is phrased is range of reasonableness of

3    the settlement in light of the best possible recovery.

4              So is the theory of liability teed off of the sales

5    of the product that was recalled?

6              MR. SULTZER:  So when I say 25 percent, your Honor,

7    that's basically just straight dollar for dollar, but in

8    reality what would happen, it's much greater than 25 percent

9    because ultimately the calculation of damages here would fall

10   upon a price-premium theory.

11             THE COURT:  Right.  Okay.

12             MR. SULTZER:  So our estimates with our experts say

13   it would be about a 30 percent price premium, so in reality, if

14   you calculate it with the price premium, it shoots it way above

15   25 percent.  But I'm just giving worst-case-scenario numbers

16   right now, like what the bottom, bottom line is, very

17   conservative estimates, and that puts it way above -- you know,

18   courts go down as low as one percent, two percent.  Lyons

19   Magnus that we did before was closer to 30 percent.  So 25

20   percent is actually a very good settlement.  And you combine it

21   with the nonmonetary relief, which we haven't valued and we're

22   not going to ask for any fees on the nonmonetary relief portion

23   of the settlement, but that's very significant as well.  We

24   didn't have any of that in Lyons Magnus.

25             THE COURT:  All right.  So to the extent that it's

1    six and change, 25 percent of that, somewhere between 24 and 28

2    million --

3              MR. SULTZER:  About 25 million.

4              THE COURT:  So 25 million.  So you're talking about a

5    price premium of that.  Then you're really looking at like 17

6    and a half million.  It's really -- yeah, you're way north of

7    25 percent.

8              MR. SULTZER:  Yes.

9              THE COURT:  I gotcha.  Okay.  That was the one thing

10    that wasn't entirely clear from the papers, but I'm glad you

11    clarified that.

12             Okay.  Anything else you want to add to the papers?

13             MR. SULTZER:  That's all I have, your Honor.

14             There is one issue, your Honor, but I don't think

15    it's an issue.  In the settlement agreement, the defendants

16    were required to pay the additional hundred thousand dollars to

17    the claims administrator I believe it was 21 days after you

18    grant -- assuming you grant preliminary approval.  They're

19    going to need more time to do that, so I just wanted to flag

20    that.  It won't impact any of the dates because I spoke to the

21    principal at Angeion and told him what was coming and I think

22    that he'll be able to start notice anyway without that and sort

23    of front the money for us as defendant needs to get that.

24             THE COURT:  Okay.

25             MR. SULTZER:  So I don't envision any issues, but I

1    just wanted to put it out there because it is in the agreement
2    and that deadline might come and go without being satisfied.
3             THE COURT:  So is the Quaker Oats Company short of
4    cash?
5             MR. SULTZER:  I don't think so.  I think Ms. Colton
6    could speak directly to that.  I think it's more of just an
7    administrative issue.
8             THE COURT:  Bureaucracy.
9             MR. SULTZER:  Yes, exactly.
10            MS. COLTON:  Your Honor, this is Lauren Colton.  And,
11   yes, it is simply an administrative issue.  So we wanted to
12   just give Mr. Sultzer a heads up that it may take longer than
13   the 21 days, but we will be working --
14            THE COURT:  Okay.  So we're not talking like 21
15   months, we're just talking about a little bit past the 21 days?
16            MS. COLTON:  Yes.  Generally it's a 60-day payment
17   cycle, but we're working to get it done as expeditiously as
18   possible.
19            THE COURT:  Got it.  All right.  That's fair.  Thanks
20   for the heads up.
21            Anything else, Ms. Colton, you want to add to the
22   conversation?
23            MS. COLTON:  No, your Honor.  Thank you.
24            THE COURT:  Okay.
25            Mr. Sultzer, anything else from your perspective?

1          MR. SULTZER:  No, your Honor.

2          THE COURT:  Anything from any of the other fine

3   attorneys on the line here?

4          MR. SCHAFFER:  No, your Honor, nothing.

5          THE COURT:  All right.  You are the only one that

6   remembered to unmute.

7          All right.  So, as I said, I've read the papers.  I

8   very much appreciate the clarification of the one issue that I

9   was going to ask about, and I appreciate counsel letting us

10  know about the issue with the hundred thousand dollars, which

11  does not seem at all like it's a problem.

12         So, as I said, this is an application, a motion, for

13  preliminary approval of a class settlement and for preliminary

14  certification of the settlement class.

15         The plaintiffs, on behalf of themselves and others in

16  a similar situation allege, that Quaker Oats engaged in

17  misleading and deceptive marketing practices with respect to

18  the manufacturing, marketing and sale of defendant's granola

19  bars and granola cereal products, which I'll just call The

20  Products for today's purposes, by failing to properly disclose

21  to customers that consumption of The Products could increase

22  their risk of contracting Salmonella and, by such conduct,

23  plaintiffs allege that defendant violated New York GBL Sections

24  349 and 350 as well as asserting other state causes of action.

25         The parties seek a nationwide class of all

1    individuals who purchased any covered products in the time

2    period as specified basically from the beginning of the sale of

3    The Products until the certification for personal, family or

4    household use and not resale except for excluded persons.

5              Covered products is defined to include products

6    recalled by defendant for potential Salmonella contamination

7    during the class period.  That's spelled out at paragraph 1.11.

8              Per the settlement, the defendant will establish a

9    non-reversionary all-cash settlement fund of $6.75 million.

10             The fund will be exhausted to pay for cash awards to

11   settlement class members, service awards to class members, any

12   fee award to class counsel as well as any other costs, fees or

13   expenses approved by the Court that exceed the initial

14   settlement and administration payment.

15             So the settlement fund is 6.75, as discussed in

16   paragraph 1.33 of the agreement, and then the exhaustion of the

17   fund is discussed in paragraph 4.5.

18             There's also the agreement we discussed here about

19   the payment of the $100,000 as an initial settlement

20   administration payment.  And we're going to let the 21 days

21   slide because Angeion doesn't seem to think it's a problem, but

22   that's in paragraph 1.1(h).

23             Now, the other thing that is part of this is the

24   nonmonetary piece and in regard to this piece, defendant

25   represents that after the first action in this litigation was

filed, it made a number of modifications to its practices and procedures regarding bacterial contamination and, in fact, closed its plant in Danville, Illinois, which was the source of the potential contamination.  This was discussed in paragraph 4.14.  Also, defendant is "continuing to diligently test its products to reduce the risk of potential bacterial contamination in the future," also in paragraph 4.14.

Now, the settlement agreement provides that each class member who submits a valid claim form and proof of purchase will receive a payment for the full purchase price of each covered product they purchased and each class member who submits a valid claim without proof of purchase will receive a payment that is the average price of up to two covered products.

Also, the named plaintiffs will receive service awards up to $500 each from the settlement fund as compensation for their time and efforts and their service as class representatives.  And this is 4.5.3 and 7.2.

Also, counsel for plaintiffs may petition the Court for an award from the settlement fund for reasonable attorneys' fees, unreimbursed costs, and expenses not to exceed more than one-third of the settlement fund, which is approximately $2.25 million.  That's paragraph 7.1.

In exchange for all of this, the settlement class members will release all claims against defendant, known or

unknown, "including, but not limited to, allegations, claims or contentions related in any way to the manufacture, testing, labeling, marketing, sales, advertising, and use of the covered products with respect to the potential for contamination by Salmonella or any other bacteria or contaminant." That's paragraph 8.1.

So, as we all know, Rule 23(e) guides the preliminary approval analysis and directs the Court to consider whether it "will likely be able to (i) approve the proposal under Rule 23(e)(2) and (ii) certify the class for purposes of judgment on the proposal." This is all in Rule 23(e)(1)(B)(i)-(ii).

"Even at the preliminary approval stage, the Court's role in reviewing the proposed settlement is demanding because the adversariness of litigation is often lost after the agreement to settle." That's from In re GSE Bonds Antitrust Litigation, 414 F.Supp.3d 682, 692.

Courts conducting this analysis "must make a preliminary evaluation as to whether the settlement is fair, reasonable and adequate." That's from Goidel v. Aetna Life Insurance Company, 2024 WL 4441806, at *3.

Now, Rule 23(e)(2) enumerates four factors for the Court to consider as part of this inquiry. So first is adequacy of representation, second is the existence of arm's length negotiations, third is adequacy of relief, and fourth is equitableness of the treatment of the class members. And this

1    is all discussed in, among other cases, Soler v. Fresh Direct,

2    LLC, 2023 WL 2492977, at *2.

3           Now, although the factors apply to final approval,

4    the Court looks to them to determine whether it likely will

5    grant final approval based on the information that's currently

6    before the Court.  That's from In re Payment Card Interchange

7    Fee & Merchandise Antitrust Litigation, 330 F.R.D. 11, 28.

8    It's an Eastern District case from 2019.

9           Also, courts in our Circuit consider the fairness of

10   a settlement under the nine factors set out in the Grinnell

11   case, 495 F.2d 448, 463.  Because the four Rule 23 factors were

12   intended to supplement rather than displace these Grinnell

13   factors, the Court considers both sets of factors in the

14   analysis.  That's from GSE Bonds at page 692.

15          In terms of adequacy of representation, adequacy

16   "entails an inquiry as to whether (1) plaintiff's interests are

17   antagonistic to the interests of other members of the class and

18   (2) plaintiff's attorneys are qualified, experienced and able

19   to conduct the litigation."  That's Soler at page 3.

20          The named plaintiffs' interest in this case is fully

21   aligned, in the Court's view, with other class members because

22   they all suffered the same injury based on defendant's alleged

23   misleading conduct.

24          Also, class counsel, and there's a bunch of them in

25   this case, but starting, of course, with the Sultzer firm, but

all the firms that are listed here, each one of them is highly
qualified, each has extensive class action experience before
this Court and in particular in consumer protection cases.  So
the Court finds that this factor is easily satisfied.

In terms of the presence of arm's length
negotiations, this is discussed in Rule 23(e)(2)(B).  Goidel
discusses it at *4.  And it's important to note that "Rule
23(e)(2) prohibits courts from applying a presumption of
fairness to a settlement based on negotiation at arm's length."
That's from Moses v. New York Times Co., 79 4th 235, 243.
Thus, the Court "reviews the parties' negotiation history and
dynamics holistically and in light of the Rule 23(e)(2)
factors."  That's from In re Canon U.S.A. Data Breach
Litigation, 2023 WL 7936207, at *3, footnote 4.

Here, both sides were very well represented by
counsel, all of whom, as I said, are well versed in class
action litigation.  The parties exchanged substantial amounts
of information and certainly enough information sufficient for
each side to evaluate the strengths and weaknesses of both the
claims and the defenses, and the settlement was reached after
weeks of negotiation.

The discovery included things related to the sale of
data of the covered products across the covered period, details
about the circumstances that led the Quaker products to be
contaminated with Salmonella, control procedures to prevent

1    future outbreaks, and information relating to the recall

2    process.

3           Now, of course, formal discovery is not a

4    prerequisite to preliminary approval.  This was noted in the In

5    re Global Crossing Securities & ERISA Litigation, 225 F.R.D.

6    436, 458.  The information exchanged here suggests that the

7    parties had a full opportunity to acquaint themselves with the

8    strength of the case prior to initiating negotiations, which

9    was an important factor noted in Reyes, 2024 WL 472841, at *3.

10          Also, the parties engaged in an all-day mediation

11   with a JAMS mediator and former Magistrate Judge for the

12   Central District of California, Jay C. Gandhi.  Judge Gandhi is

13   highly experienced in consumer protection class actions, having

14   presided over a number of consumer protection class actions

15   during his time on the bench, and he had spent 12 years in

16   litigation in MDLs and class actions prior to becoming a judge.

17   So it's pretty hard to get anybody more qualified than Judge

18   Gandhi.  And so it was with Judge Gandhi's assistance that the

19   parties were able to work out and agree in principle and then

20   spent several weeks working out the details of the agreement.

21   This is discussed in the Sultzer declaration at paragraph 22.

22          So, in the Court's view, this record is more than

23   sufficient for the Court to find that the settlement here was

24   the result of good faith and arm's length negotiations, and so

25   that factor is satisfied.

1    The third factor involves adequacy of relief and it

2  encompasses a host of considerations, including the costs,

3  risks and delay of trial; the effectiveness of any proposed

4  method of distributing relief; the terms of any proposed fee

5  award; and a review of agreements required to be identified

6  under Rule 23(e)(3).

7    Now, this factor does overlap with the Grinnell

8  factors of complexity, expense and likely duration of the

9  litigation along with the risks of establishing liability, the

10  risks of establishing damages, and the risks of maintaining a

11  class through trial.  This was all discussed in the Sonterra

12  case, 2023 WL 3749996, at *4.

13    So to assess the adequacy of relief, "courts may need

14  to forecast the likely range of possible classwide recoveries

15  and the likelihood of succes in obtaining such results."

16  That's from In re Payment Card, 330 F.R.D. at 36.

17    The Court also considers the proposed release from

18  liability as an additional factor because that affects the

19  determination of the fairness, reasonableness and adequacy of

20  class relief.

21    The bottom line is that the Court has to determine

22  whether the settlement agreement is likely to provide effectual

23  relief to the class.

24    Now, in this case, plaintiffs did face uncertainty in

25  terms of moving forward.  There were the possibility of

1    multiple defenses on the merits.  Specifically, defendant could

2    have asserted defenses based on its lack of knowledge that the

3    covered products could potentially be contaminated with

4    Salmonella and issues related to its voluntary recall of the

5    covered products.  And, of course, this case, like many

6    consumer cases, could have easily involved a battle of experts

7    regarding the extent and cause of the Salmonella contamination,

8    risk of contamination, et cetera, which not only would be time

9    consuming, but extremely costly.  And there are also risks

10   associated with proceeding with a class.  The defense always

11   could have contested class certification, could have moved to

12   decertify at later stages of the case.  All of these are the

13   types of risks that militate in favor of the settlement.

14          And by the way, even if plaintiffs had prevailed,

15   either after motion practice or a trial, there would have been

16   the usual amount of post-trial motions and, of course,

17   appellate litigation that could have dragged this case on for

18   years and that also favors approval of the settlement.

19          In terms of the method of processing class member

20   claims, this is mostly set forth in paragraph 4.6 of the

21   settlement agreement and, in the Court's view, appears to be an

22   effective form of relief.

23          So, here, as mentioned, the class members who submit

24   a timely claim form along with proof of purchase will receive

25   the full purchase price for each unit of covered product.

1    That's in 4.6.1.  A claim form without proof of purchase will

2    receive the average retail price for up to two covered products

3    plus a 10 percent allowance for sales tax.  That's 4.6.2.  The

4    class members who already received reimbursement through the

5    recall process or whose household members received

6    reimbursement as a result of the recall process, the amount of

7    their payment shall be decreased by the amount they were

8    reimbursed.  4.6.3.  Settlement class members' share may be

9    increased or decreased on a pro rata basis such that the total

10   amount paid to all class members equals the available

11   settlement fund.  That's 4.6.4.

12            Unsurprisingly, many courts in the Second Circuit

13   have approved similar claim administration processes.  Among

14   the most recent ones, Rankins v. Arca Continental S.A.B. de

15   C.V., 2024 WL 4986411, at *7, an Eastern District case, and a

16   Southern District case, Mayhew v. KAS Direct, LLC, 2018 WL

17   3122059, at *11.  This process also was clearly developed by

18   competent and highly experienced class counsel in consultation

19   with a neutral and experienced settlement administrator, which

20   also favors approval.  This is discussed in Reyes at *4.

21            The Court is also satisfied that the preliminary

22   outlines for the request for attorneys' fees is reasonable.

23   Any fee application in this case is capped at one-third of the

24   settlement fund.  That's at paragraph 7.1.  And, of course,

25   courts in our Circuit have routinely approved settlement

1  agreements with near-identical provisions.  Among the cases are

2  Reyes, at *4; Sonterra, at *4; and GSE Bonds, at page 695.

3          Of course, as counsel knows, before any final

4  approval of fees can be approved, there's the need to submit

5  additional material, and I'm sure that will be forthcoming at

6  the appropriate time.

7          Also, the Court finds, at this stage, that the

8  proposed relief is adequately tailored to the class members'

9  claims.

10          So, while the release -- I'm not going to read it

11  into the record.  It's in paragraph 8.1.  Although the release

12  broadly includes unknown and future claims of any type,

13  including for bacteria and contaminants other than Salmonella,

14  "the law is well established in this Circuit and others that

15  class action releases may include claims not presented and even

16  those which could not have been presented as long as the

17  released conduct arises out of the identical factual predicate

18  as the settled conduct."  That's Wal-Mart Stores, Inc.  v. Visa

19  U.S.A., Inc.,  396 F.3d 96, 107.

20          In the Court's view, the release in this case is

21  sufficiently circumscribed because it only releases claims

22  "arising out of or related to" the claims asserted in the

23  amended complaint during the specific class period.  And so

24  that satisfies the sort of identical factual predicate

25  requirement that's been discussed in the cases.

1          In terms of equitable treatment, this factor explores

2     "whether the apportionment of relief among class members takes

3     appropriate account of differences among their claims and

4     whether the scope of their release may affect class members in

5     different ways that bear on the apportionment of relief."

6     That's a direct quote from Rule 23(e)(2)(D).

7          Here, because the class members have near-identical

8     claims across the class, differing only in the amount of the

9     price they paid the defendant, the parties' proposed

10    distribution scheme is a simple and sufficiently equitable way

11    to apportion relief.  There's a similar holding in Rankins,

12    2024 WL 4986411, at *8.  The Court there held that the

13    settlement agreement met the equitable treatment requirement

14    where it provided for disbursement to class members according

15    to products claimed.

16         Also, to the extent that the named plaintiffs will

17    receive a $500 service award, the Court finds this award is

18    well within the range of service awards regularly approved by

19    courts within our district, and given the work by plaintiffs

20    here, there is no reason to come out differently.  And the

21    case, by the way, that's similar is Reyes at *6, n.5.

22         Now, there's two Grinnell factors that are not

23    addressed by 23(e)(2).

24         Ability of defendants to withstand the greater

25    judgment.  I think there's no disputing here that defendant can

withstand a greater judgment.  It sounds like they have some

bureaucratic issues, but in terms of the monetary hit, they're

going to be able to survive.  But, of course, as plaintiffs

note, this factor standing alone is not enough to deny

preliminary approval.  That was noted in GSE Bonds at 696;

Reyes, at *6, among other cases.

          In terms of range of reasonableness, the Court is to

examine the "range of reasonableness of the settlement in light

of the best possible recovery" taking into account "all the

attendant risks of litigation."  That's from In re Payment

Cards, 330 F.R.D. at 47-48.  In that inquiry, the Court

compares a settlement amount with plaintiffs' "best possible

recovery," assuming complete victory on both liability and

damages.  That's also from In re Payment Card at 47-48.

          So what we discussed here is that the settlement

amount of 6.75 million, just in terms of the monetary amount,

is roughly 25 percent of the total sales, but the theory of

damages here is its price premium, which means the recovery

here is substantially higher than the 25 percent and that is

slightly above the range of what courts regularly have approved

within our Circuit.  So I think that factor is also easily

satisfied.

          Now, in terms of the likelihood of class

certification, to preliminarily approve a settlement, the Court

also has to find it is likely to certify a putative settlement

1   class.  That's discussed in Rule 23(e)(1)(B)(ii).  "A court may

2   certify a class for settlement purposes where the proposed

3   settlement class meets the requirements for Rule 23(a) class

4   certification as well as one of the three subsections in

5   23(b)."  And that's from GSE Bonds at 700.

6           The threshold requirements under Rule 23(a) are

7   numerosity, commonality, typicality and adequacy of

8   representation.  All four are met here.

9           Numerosity.  The magic number is 40.  We're way above

10  that here, so that's satisfied.

11          Commonality requires that there at least be one

12  common question capable of classwide resolution in that

13  determination of its truth or falsity will resolve an issue

14  that is central to the validity of each one of the claims in

15  one stroke."  And that's from Wal-Mart Stores, Inc. v. Dukes,

16  564 U.S. 338, 350.  That requirement is likely met here because

17  the class members are unified by common factual allegations and

18  legal theories, specifically the allegation that defendant

19  failed to disclose that the covered products potentially

20  contained Salmonella and that that was likely to deceive

21  reasonable consumers.  Therefore, because the same alleged

22  conduct by the same defendant gives rise to the same kind of

23  claims among all the class members, commonality is easily

24  satisfied.

25          Typicality is satisfied when each class member's

1    claim arises from the same course of events and each class

2    member makes similar legal arguments to prove the defendant's

3    liability.  That's from Brown v. Kelly, 609 F.3d 467, 475.

4    That bar is easily cleared here, again, where plaintiffs'

5    contention about defendant's conduct is presented really in the

6    same way and affected plaintiffs across the board in the same

7    way.

8            Rule 23(a)(4) states that the Court has to determine

9    that "the representative parties will fairly and adequately

10   protect the interests of the class."  Given the similarity of

11   this inquiry to the adequacy inquiry under Rule 23(e)(2)(A),

12   the Court will likely find that this requirement is met.  And

13   GSE Bonds, at page 701, reached a similar conclusion.

14           Because plaintiffs seek to certify the class under

15   Rule 23(b)(3), the Court also examines whether questions common

16   to the class predominate over any questions affecting only

17   individual members and whether a class action is superior to

18   other methods adjudicating the controversy.

19           Here, plaintiffs' common issues, including whether

20   defendant's failure to disclose the potential presence of

21   Salmonella in its products was likely to deceive a reasonable

22   consumer, clearly predominate over individual issues as to each

23   class member.  There is a similar analysis in Soler, at *6.

24           The Court also finds that class action is the

25   superior means of litigating this case because the purchasers

of defendant's products likely would receive a small recovery,

creating little incentive for purchasers to pursue individual

claims and, thus, a class action is the most effective and

efficient mechanism to resolve these issues.

          With respect to the proposed notice plan, both Rule

23(c) and the Due Process Clause demand notice calculated to

"fairly apprise the prospective members of the class of the

terms of the proposed settlement and of the options that are

open to them in connection with the proceedings."  That's from

the Second Circuit's Wal-Mart Stores case at page 114.

          With respect to 23(b)(3) classes, the Court must

direct "the best notice that is practicable under the

circumstances, including individual notice to all members who

can be identified through reasonable effort."  In addition, the

notice has to state in clear and plain language, first, the

nature of the action; second, a class definition; third, the

class claims; fourth, that a class member may appear through an

attorney; fifth, that a class member may opt out; six, the time

and manner of opting out; and, seven, the binding effect of a

class judgment.

          And, of course, the adequacy of the notice under Rule

23 or the Due Process Clause is ultimately measured by

reasonableness.  This is discussed in Masters v. Wilhelmina

Model Agency, Inc., 473 F.3d 423, 438, a Second Circuit

decision from 2007.

1          In the Court's view, the proposed notice satisfies

2    the substantive requirements.  At bottom, it provides

3    information about all the things that it's required to provide

4    information about.

5          Also, the proposed notice is eminently reasonable.

6    There's been a development of a specific notice program with

7    the assistance of Angeion, which is an experienced settlement

8    administrator.  The notice plan provides a robust internet

9    campaign that was designed to reach 75.14 percent of a target

10   audience of 17.7 million individuals 3.01 times each.  This is

11   all discussed in the Angeion statement at paragraphs 19 through

12   31.  So Angeion plans to use "programmatic advertising," which

13   uses an algorithm to identify target demographic profiles based

14   on objective syndicated data that is routinely used by

15   advertising agencies and experts to target and understand

16   particular consumer groups.  This is discussed at paragraph 24

17   of Angeion's statement.  And this approach has been approved in

18   other cases, including Mayhew v. KAS Direct, LLC, 2008 WL

19   3122059, at *9.

20         And I'll also note that the notice plan provides for

21   a dedicated settlement website where class members can view

22   information about the settlement agreement and review relevant

23   documents.  This is in paragraph 5.2.1 of the settlement

24   agreement.  And there's going to be a toll-free hotline to

25   further apprise class members of their rights.  That's 5.2.2.

1          Also, the settlement administrator is going to serve

2     appropriate notice upon the Attorney General of the United

3     States and other required government officials informing them

4     of the proposed settlement as required by 28 U.S.C. Section

5     1715.  That's from paragraph 5.4.

6          So, therefore, the Court finds that the notice plan

7     satisfies the requirements in 23(e) as well as the other legal

8     and due process requirements.

9          So, for all these reasons, the application is

10    granted.

11         So, Mr. Sultzer, I don't know if you want to just

12    submit an updated schedule.  Now that we've had this conference

13    and I've ruled, we can start the clock ticking.  So do you

14    think you can do that in the next day or so?

15         MR. SULTZER:  Yes, your Honor.  We can get something

16    out this afternoon.  Should we just file that on the docket or

17    send it to your chambers?

18         THE COURT:  You can file it on the docket and, that

19    way, there's a record of you doing it.

20         MR. SULTZER:  Okay.

21         THE COURT:  And we'll go ahead.  I guess -- yes.  I

22    mean, you can fill out the dates.  The only thing, obviously,

23    when we have the return date -- if you want to just call

24    chambers, maybe, and get a date so you can just put that in the

25    order, that's probably the most efficient way to do it.

```
 1              MR. SULTZER:  Okay.  We'll do that.  I think --
 2              THE COURT:  Do you have an idea roughly when you --
 3    I'm sorry.  Go ahead.  What was that?
 4              MR. SULTZER:  I think we're looking for the final
 5    approval sometime in early August.
 6              THE COURT:  Okay.  We can do that now.
 7              So it has to be the very beginning of August, like
 8    that first week, like the week of maybe the 4th or maybe August
 9    1 or -- so, Dawn, to we have something like the 4th or 5th?
10              THE DEPUTY CLERK:  I'll look right now.
11              (Pause)
12              THE DEPUTY CLERK:  We can do the 4th, Judge.
13              THE COURT:  Okay.  What time?
14              THE DEPUTY CLERK:  10.
15              THE COURT:  All right.
16              Does that work, Mr. Sultzer?
17              MR. SULTZER:  Yes.  That's good, your Honor.
18              THE COURT:  Okay.  So if you want to put that in and
19    then you can back out the other dates.  Go ahead and file that
20    and we'll get it docketed.
21              MR. SULTZER:  Okay.  Will that be, your Honor, in
22    person or over the phone again?
23              THE COURT:  Over the phone.
24              MR. SULTZER:  Okay.
25              THE COURT:  That way, you can do it from the beach if
```

```
1    you want, Mr. Sultzer.

2              MR. SULTZER:  Wouldn't that be nice.

3              THE COURT:  Yeah.

4              All right.  Anything else from anybody else?

5              UNIDENTIFIED SPEAKER:  What date was that final date

6    on, Judge?  I couldn't hear.

7              THE COURT:  August 4th at 10 a.m.

8              UNIDENTIFIED SPEAKER:  Great.  Thank you.

9              Nothing more for me.  Thank you.

10             THE COURT:  Ms. Colton, anything from your side?

11             MS. COLTON:  No, your Honor.  Thank you.

12             THE COURT:  Okay.  Thanks, everybody.  Enjoy the rest

13   of the day.

14             We are adjourned.
                                  ----
15

16

17

18

19

20

21

22

23

24

25
```