UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
**Raymond Kessler, Hartence Hill, Lazaro Rodriguez, Teresa Herendeen, and Barbara Abreu individually and on behalf of all others similarly situated,**

                    **Plaintiffs,**

v.                                    Case No.: 7:24-cv-00526

**The Quaker Oats Company,**

                    **Defendant.**

------------------------------------------------------------x

## DECLARATION OF JASON SULTZER IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

**I.    INTRODUCTION**

I, Jason P. Sultzer, submit this Declaration in support of Plaintiffs' Motion for Final Approval of Class Action Settlement, and affirm that the following is truthful and accurate:

1. I am one of the attorneys principally responsible for the handling of this case. I am personally familiar with the facts set forth in this declaration. If called as a witness, I could and would competently testify to the matters stated herein.

2. Attached as **Exhibit 1** is the Settlement Agreement with exhibits in this action.

3. This proposed class action settlement would resolve the claims of purchasers of Defendant The Quaker Oats Company ("Quaker" or "Defendant") food products ("Covered Products").

4. Plaintiffs seek to represent a nationwide class of consumers who purchased the Covered Products. Plaintiffs' Counsel has substantial experience in prosecuting class actions and in particular actions that involve contamination of consumer products. *See, e.g. Clinger v.*

1

*Edgewell* Personal *Care Brands,* LLC, 3:21-cv-01040-JAM (D. Conn); *Bangoura v. Beiersdorf, Inc. et al*, 1:22-cv-00291-BMC (E.D.N.Y.) (Cogan, J.); *Catalano v. Lyons Magnus, LLC*, Case No. 7:22-cv-06867) (S.D.N.Y. April 10, 2024) (Karas, J); *Swetz v. The Clorox Company*, No. 7:22-cv-9374 (S.D.N.Y.) (Halpern, J.); *Patora v. Colgate-Palmolive Co.*, No. 7:23-cv-01118-VB (S.D.N.Y.) (Bricetti, J.)

5. On March 13, 2025, the Court granted Plaintiffs' Motion for Preliminary Approval of the Class Action Settlement in this action and granted related relief. ECF No. 34 (Preliminary Approval Order). In that Order, the Court conditionally designated me and seven other lawyers as Class Counsel for the Settlement Class. ECF No. 34 at ¶ 6. Those lawyers are: Charles E. Schaffer of Levin Sedran & Berman, Jeffrey Brown of Leeds Brown Law, P.C., Michael R. Reese of Reese LLP, Nick Suciu III of Milberg Coleman Bryson Phillips Grossman, PLLC, Paul Doolittle of Poulin Willey Anastapoulo, Joshua Arisohn of Bursor & Fisher, P.A., and Jeffrey S. Goldenberg of Goldenberg Schneider, LP.A. (collectively, Class Counsel"). *Id*.

6. Per the terms of the Settlement Agreement, the Settlement Fund means a total payment by Defendant in the amount of $6,750,000. *See* Ex. 1. Assuming the Court grants the Attorneys' Fees and Costs in the amount of $2,250,000, the Incentive Awards to the Class Representatives in the total amount of $2,500.00, and the estimated costs of the notice and administrative costs in the amount of $396,545.00 ($100,000 of which was covered by an initial settlement administration payment made by Defendant, per the Settlement Agreement), the estimated Available Settlement Funds amount to $4,100,955.00.

7. The reaction to the Settlement has been overwhelmingly favorable.

8. Only one objection has been filed to the Settlement and only fifteen (15) valid requests for exclusion has been received by the Claim Administrator. As will be briefed separately, the lone objector has refused to validate his identity and does not have standing to make his

2

objection inasmuch as he did not purchase a Covered Product. Moreover, the objections he asserts are based on meaningless technical complaints, rather than changes that would improve the actual Settlement.

9. As a result of the robust Notice Program, the Claim Administrator has received 140,712 Valid Claim forms.

10. The average purchase price of the Covered Products is approximately $6.92. On average, Class Members who made Valid Claims will recover substantially more than that amount.

11. Another significant factor supporting final approval is the social benefit for consumers and society as a whole. Because settlements like these require companies to pay millions of dollars that ultimately impacts profitability, it deters corporations from allowing potentially harmful product contaminations from entering the stream of commerce and encourages stricter testing protocols and to maintain cleaner facilities. Here, Plaintiffs obtained significant non-monetary relief. Specifically, after the first Action in the Litigation was filed, Defendant made modifications to its practices and procedures to prevent future bacterial contamination, and also expanded the Recall to include additional products that were potentially contaminated with Salmonella. Moreover, Defendant closed the plant in Danville, Illinois that manufactured the recalled food. In addition, Defendant is continuing to diligently implement its food safety programs to reduce the future risk of bacterial contamination.

II. **BACKGROUND, PROCEDURAL HISTORY, AND SETTLEMENT**

12. Before commencing the Litigation, Class Counsel discussed the case with hundreds of potential named plaintiffs and extensively investigated and analyzed, among other things, Defendant's marketing campaign, the relevant FDA guidelines concerning labeling and advertising disclosure requirements for food products, FDA guidelines regarding the presence of

Salmonella in food products, the scientific research concerning the dangers of Salmonella, and research regarding how Defendant should have known the Products contained or were at risk of containing Salmonella. Class Counsel also conducted extensive testing of the Products to determine the actual contamination rate.

13.     On or around December 27, 2023, Plaintiff Teresa Herendeen filed a Recall-related putative nationwide class action lawsuit against Quaker, captioned *Herendeen v. The Quaker Oats Company*, No. 1:23-cv-17103 (N.D. Ill.) asserting claims for negligence, breach of express warranty, breach of implied warranty of merchantability, fraudulent misrepresentation, fraud by omission and unjust enrichment in connection with her alleged purchase of one or more recalled products. Plaintiff Kessler filed the instant action on or about January 24, 2024, asserting claims for violation of New York General Business Law Sections 349 and 350 in connection with his alleged purchase of one or more recalled Products.

14.     Subsequently, an additional action was filed in the Northern District of Illinois (*Hill v. The Quaker Oats Company*, No. 1:24-cv-02609 (N.D. Ill.), and two other Plaintiffs (Plaintiffs Rodrigues and Abreu) sent pre-suit notice letters threatening a Recall-related putative class action lawsuits and asserting claims in connection with the alleged purchase of one or more recalled Products.

15.     Class Counsel took it upon themselves to self-organize and coordinate the actions so that all the cases would proceed before this Court, eliminating duplication for the parties and the Courts and limiting the expense to both sides. This coordination also avoided a potentially lengthy leadership fight among counsel for Plaintiffs in the three actions and two unfiled cases.

16.     Class Counsel worked together to thoroughly analyze the legal landscape, including conducting research into the various state consumer protection laws and available remedies, Article III standing, preemption and evaluating matters relating to class certification, in order to

4

fully evaluate the risks and benefits to a potential early resolution.

17. Indeed, Class Counsel worked cooperatively to coordinate the Litigation and to save judicial time and resources to consolidate the multiple similar litigations without a protracted battle for lead counsel and to lead the case to mediation and an early resolution.

18. Based on the Parties' exchange of information to date and their respective investigations into the claims and defenses asserted in the actions, the Parties agreed to proceed to private mediation with the Honorable Jay C. Gandhi (Ret.). In advance of the mediation, the Parties exchanged discovery relevant to their claims and defenses. This included discovery related to Plaintiffs' claims, including extensive sales, distribution and marketing information regarding the Covered Products, and the technical scientific information pertaining to the manufacturing process and suppliers regarding the sources and reasons for the Salmonella contamination, as well as the protocols put in place by Defendant to ensure that such a contamination does not reoccur. This is largely the same information that would have been produced had the case proceeded to formal discovery. Accordingly, the Parties were sufficiently informed at the time of the mediation of the strengths and weaknesses of their respective positions, the size of the putative class, and the damages at issue to negotiate a reasonable settlement.

19. In addition, Class Counsel conducted significant legal research and an investigation into industry reports, scientific literature, and the Covered Products' market segment as follows:

   a. Class Counsel thoroughly analyzed the legal landscape and evaluated the risks and benefits of prosecuting the Litigation and an early resolution, including research into the various state consumer protection laws and available remedies, and evaluating class certification issues.

   b. Class Counsel extensively analyzed the claims alleged in the complaints, Defendant's advertising campaigns, the relevant regulations and guidelines concerning labeling and advertising disclosure requirements for consumer products such as the contaminated Quaker products, regulations and guidelines regarding the presence of hazardous and dangerous substances such as bacteria in consumer products, the scientific research and literature concerning the dangers of bacteria (including *Salmonella*), and research regarding how Defendant should have known

       the Products contained or were at risk of containing bacteria.

    c. Class Counsel investigated and consulted with industry experts regarding inter alia the presence of bacteria in beverage and nutrition products, regulations governing bacteria in consumer products, potential sources and elimination of that source of bacteria in consumer products, and testing and screening for bacteria in consumer products.

    d. Class Counsel analyzed the chain of distribution of the Covered Products and pricing per unit to help support and determine Plaintiffs' damages model, as well as the exact scope of the recall.

    e. Class Counsel investigated and consulted with experts regarding damages models for consumers purchasing an adulterated and or misbranded product contaminated with bacteria.

    f. Class Counsel conducted research into the market segment related to the Covered Products to understand the potential scope of this matter, economic losses to Class Members, and marketing and sales trends, practices, and patterns.

20. Class Counsel also conducted testing of the products to determine the scope of potential contamination

21. On April 11, 2024, the Parties attended a full-day mediation with Judge Gandhi.

22. With Judge Gandhi's assistance, the Parties reached a non-reversionary common fund settlement. However, the Parties continued to pursue settlement discussions for several months, working out the details of the settlement.

23. Before and during these settlement discussions and mediation, the Parties had arm's-length exchange of sufficient information to permit Plaintiffs and their counsel to evaluate the claims and potential defenses and to meaningfully conduct informed settlement discussions.

24. The Parties did not discuss Attorneys' Fees and Costs or any potential Incentive Award until they first agreed on the substantive terms of this settlement.

25. On April 26, 2024, the Parties informed the Court that they had reached a resolution on the matter and requested permission to file a consolidated amended complaint and a motion for preliminary approval, which the Court granted. (Dkts. 7 & 8). On May 24, 2024, Plaintiffs filed a consolidated amended complaint for the purposes of settlement. (Dkt. 9). The consolidated

amended complaint alleges violations of New York, Ohio, and Connecticut consumer protection laws and claims for breach of express and implied warranties, fraud, and negligent misrepresentation and unjust enrichment. Id.

26. On June 24, 2025, the Parties executed the Settlement Agreement, and Plaintiffs moved for preliminary approval of the class action settlement. (ECF No. 10).

27. With respect to selecting a settlement administrator, before selecting Angeion, Plaintiffs sought multiple bids from claims administrators and interviewed and vetted Angeion and its proposed notice plan for this settlement.

28. The parties selected Angeion based on its reputation for excellent work and breadth of experience administering other similar consumer class actions and the state-of-the-art fraud detection system (an issue that has become more prevalent in the digital age). For example, Angeion has administered very similar settlements regarding contamination of consumer products. See *Bangoura v. Beiersdorf, Inc. et al*, 1:22-cv-00291-BMC (E.D.N.Y.); *Catalano v. Lyons Magnus*, LLC, No. 7:22-cv-06867) (S.D.N.Y.); *Swetz v. The Clorox Company*, No. 7:22-cv-9374 (S.D.N.Y.); *Patora v. Colgate-Palmolive Co.*, No. 7:23-cv-01118-VB (S.D.N.Y.). *See also In re Novartis*, 2024 U.S. Dist. LEXIS 132677, *15 (S.D.N.Y. Jul. 26, 2024) (finding that "Angeion's fraud detection system is robust and appropriately designed to weed out fraudulent claims.").

29. On March 13, 2025, the Court granted Plaintiffs' Motion for Preliminary Approval of the Class Action Settlement, Preliminary Certification of Settlement Class and Approval of Notice Plan and scheduled a Final Approval hearing for August 4, 2025 (ECF No. 34).

**SUMMARY OF SETTLEMENT BENEFITS AND RISKS OF CONTINUED LITIGATION**

30. As stated above, Class Counsel has substantial experience in prosecuting class actions of a similar size, scope, and complexity; and in particular actions that involve contamination of consumer products. *See, e.g. Clinger v. Edgewell Personal Care Brands,* LLC, 3:21-cv-01040-

7

JAM (D. Conn); *Bangoura v. Beiersdorf, Inc. et al*, 1:22-cv-00291-BMC (E.D.N.Y.) (Cogan, J.); *Catalano v. Lyons Magnus, LLC*, Case No. 7:22-cv-06867) (S.D.N.Y. April 10, 2024) (Karas, J); *Swetz v. The Clorox Company*, No. 7:22-cv-9374 (S.D.N.Y.) (Halpern, J.); *Patora v. Colgate-Palmolive Co.*, No. 7:23-cv-01118-VB (S.D.N.Y.).

31. Class Counsel has made $6.75 million in valuable benefits available to Class Members which will be exhausted to pay all Approved Claims, as well as any attorneys' Fee Award, Service Awards, and Notice and Other Administrative Costs that the Court approves. §3.1. In addition, Plaintiffs were able to negotiate and secure an additional $100,000 from Defendant towards the cost of the notice, which will help preserve funds available from the Common Fund to the Class. And, after the lawsuit was filed, Defendant made modifications to its practices and procedures regarding bacterial contamination, and also expanded the Recall to include additional products. Moreover, Defendant closed one of its plants where the Covered Products were manufactured. § 4.1, 4.14. Class Members who submit a Valid Claim that is not accompanied by Proof of Purchase shall receive the total of the average retail price for up to two (2) Covered Products claimed per household, with Quaker to provide the average retail prices of the Covered Products to the Class Administrator. §4.6.2. Class Members who submit a Valid Claim that is accompanied by Proof of Purchase of a Class Product shall be entitled to receive a full refund of the amount of money he or she spent on the Class Products that is documented by Proof of Purchase. §4.6.1. If a Settlement Class Member or any person in that Settlement Class Member's Household received Recall Reimbursement from Defendant, as reflected on the Settlement Class Member's Claim Form or in the records of Defendant, the amount of that Settlement Class Member's payment shall be reduced by the amount of Recall Reimbursement that Settlement Class Member or persons in that Settlement Class Member's Household have received (provided that the payment shall not be reduced below $0.00). § 4.6.3. Each Settlement Class Member's payment

8

shall be increased or decreased on a pro rata basis such that the total amount paid to all Settlement Class Members equals the Available Settlement Funds. § 4.6.4.

32. The Settlement achieved by Class Counsel benefits individual Class Members who submitted claims in a number of ways. First, besides putting money directly in their pockets, it has significantly expanded the scope of Defendant's recall/refund program. Under the terms of the Settlement, Class Members with proof pf purchase receive the full purchase price of the Products they bought. Class Members without proof of purchase or the average price of the Products for up to two products. This is compensation that was not available through Defendant's recall of the Products at issue in the litigation, which required proof of purchase in order to receive a reimbursement in certain circumstances. Quaker's recall program provided approximately $2.6 million in refunds or coupons to consumers, while the Settlement makes approximately $4,100,955.00 in compensation directly available to Class Members.

33. Second, the Settlement benefits the entire Class as a whole, whether Class Members submitted a claim or not, because it provides for a high percentage of the total possible recovery in this litigation in the event the case was successfully tried to conclusion. The total sales of the Products that are the subject of the litigation and which are potentially contaminated and potentially reached consumers' hands during the relevant time period is approximately $27.6 million (using a 5% contamination rate, which is likely higher than the actual contamination rate based on Defendant's representations and Plaintiffs' own testing). The $6.85 million recovery for the Class under the settlement represents approximately 25% of Defendant's potential liability under a total disgorgement theory. This alone is a very significant recovery, especially considering the difficulty in successfully litigating these types of cases, the risks of losing before or at trial, and how efficiently this Settlement was achieved.

34. The full disgorgement theory would have been challenged by Defendant at trial and

may not have succeeded, as Defendant likely would argue that even contaminated products are not completely worthless. As a result, Plaintiffs' damage model may have been limited to the premium class members paid over what they would have paid had they known about the contamination or risk of contamination. This kind of "price-premium" damages analysis is widely accepted in consumer deception cases in this Circuit.

35.     Based on Class Counsel's experience in these kinds of consumer product contamination cases, as well as discussions with an economic expert who frequently uses conjoint analysis to calculate damages in similar cases, the best-case, price-premium scenario for products like this is generally around 30% of the purchase price. Here, the Settlement Class's best day under a 30% price premium model would be $9.2 million dollars, and the Settlement Agreement provides 74% of this value. Thus, the class here is recovering somewhere between approximately 25% of what it might have recovered at trial (full disgorgement) and 74% of the price premium. Even on the low end, this is a significant recovery.

36.     The Settlement Agreement mitigates risks and costs by providing an immediate and certain substantial monetary recovery and alleviates the risk of continued litigation.

37.     While Plaintiffs believed in the viability of their claims, Defendant's anticipated defenses posed a significant risk that the case would be dismissed and Plaintiffs and the Settlement Class would receive nothing. The next steps in the litigation would have been resolution by the Court of Defendant's anticipated motion to dismiss, Plaintiffs' forthcoming motion for class certification, and Defendant's forthcoming motion for summary judgment. At minimum, these efforts would be costly and time-consuming for the Parties and the Court, and create the risk that a litigation class would not be certified and/or that the Settlement Class Members would recover nothing at all.

38.     Further, Defendant is represented by one of the largest and best defense firms in the

country, which is well-versed in class action litigation, and Defendant has indicated that it would continue to assert numerous defenses on the merits.

39. If litigation proceeds, Defendant's arguments could completely defeat, or significantly narrow, the scope of the Litigation, claims, and damages through, inter alia, successful dispositive motions or opposition to class certification.

40. In addition, if the litigation proceeded to trial, both sides would offer expert testimony on liability and damages.

41. Plaintiffs would undoubtedly face a challenge to their class-wide damages expert who would proffer a methodology for calculating aggregate class-wide economic injury. Such an expert undertaking is costly, and Plaintiff expects Defendant would challenge Plaintiffs' ability to calculate a price premium class wide.

42. Plaintiffs acknowledge the complexity in the resolution of whether advertising claims deceive reasonable consumers. A rigorous battle of the experts would include survey analyses and disputed damages analyses.

43. There is a substantial risk that a jury may accept Defendant's experts' testimony and damages arguments or award far less than the settlement amount or nothing at all.

44. While confident in their claims, Plaintiffs nonetheless face significant risks in establishing liability.

45. If litigation continues, Plaintiffs and Class Counsel are also aware that Defendant would oppose class certification vigorously, and that Defendant would prepare a competent defense at trial. And while Plaintiffs and Class Counsel were confident in the claims alleged, it is entirely possible that the Court could have sided with Defendant, leaving Plaintiffs and Class Members empty-handed.

46. The outcome of these proceedings cannot be certain, and if the litigation proceeds

11

to trial, it will be a lengthy and complex affair with appeals likely to follow.

47. Consistent with Second Circuit jurisprudence, in settling the litigation, Plaintiff accounted for the estimated damages, the benefits and risks of continuing litigation against Defendant, and the range of possible outcomes should the litigation continue.

48. The settlement also will provide an immediate and certain benefit to the Settlement Class and will avoid the substantial burdens and costs that continued and uncertain litigation would impose on the parties, non-party witnesses, and the courts. Furthermore, there are many steps between here and any potential verdict.

49. Even assuming arguendo, that continued litigation might result in a larger recovery than the settlement, it would occur only after the expenditure of hundreds of thousands of dollars in costs and expenses (at best) that would eat up much of any increased recovery.

50. Millions of dollars worth of potentially contaminated Covered Products were sold during the relevant time period. Clearly, the class consists of at least thousands of consumers who purchased the Covered Products.

51. Here, the reaction of the Class Members to the Settlement has been overwhelmingly positive. Class Notice has been provided to the Settlement Class Members in accordance with the requirements of Rule 23(c)(2)(B) and the Preliminary Approval Order. We believe that only one Class Member objected to the Settlement, and only fifteen (15) submitted valid opt outs.

52. Notably, the lone objection to the Settlement takes issue with certain procedural aspects of the claims process, but does not object to the adequacy of the relief provided to the Class. The fact that there has been only one single objection (mainly to procedural aspects of the claims process) out of hundreds of thousands of class members is strong evidence of the fairness of a settlement. Moreover, for reasons that Class Counsel will set forth in greater detail in their separate response to the objection, the objection is meritless.

53. Even if Plaintiffs could have defeated a motion to dismiss, obtained a class certification order and proceeded to trial, victory before the trier of fact would have been uncertain. Such uncertainty, moreover, was compounded by the appeals virtually certain to have followed any verdict. In short, while Class Counsel believes that the claims are viable and strong, there can be no denying the array of serious class-wide risks, any one of which could have precluded the Class and its counsel from recovering anything at all.

54. By any standard, this Settlement constitutes a favorable result made possible by the dedication and skill of Class Counsel under very difficult circumstances.

55. Moreover, Class Counsel are qualified, experienced, and generally able to conduct the Litigation. Class Counsel have invested considerable time and resources into the prosecution of the Litigation and possess a long and proven track record of the successful prosecution of class actions, including false advertising cases, and numerous appointments as class counsel

56. No other agreements between the Parties exist other than the Settlement Agreement.

57. Sultzer & Lipari's firm resume can be found at ECF Doc. 13-3.

58. Levin Sedran & Berman LLP's firm resume can be found at ECF Doc. 13-4.

59. Milberg Coleman Bryson Phillips Grossman, PLLC's firm resume can be found at ECF Doc. 13

60. Poulin, Willey, Anastapoulo, LLC's firm resume can be found at ECF Doc. 13-6.

61. Bursor & Fisher, P.A.'s firm resume can be found at ECF Doc. 13-7.

62. Goldenberg Schneider, L.P.A's firm resume can be found at ECF Doc. 13-8.

63. Leeds Brown Law P.C.'s firm resume can be found at ECF Doc. 13-9.

64. Reese LLP's firm resume can be found at ECF Doc. 13-10

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed this 14th day of July, 2025 in Poughkeepsie, New York.

/s/ Jason Sultzer
Jason Sultzer