**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
**Raymond Kessler, Hartence Hill, Lazaro**
**Rodriguez, Teresa Herendeen, and Barbara Abreu**
**individually and on behalf of all**
**others similarly situated,**

                **Plaintiffs,**

**v.**                                                    **Case No.: 7:24-cv-00526**


**The Quaker Oats Company,**

                **Defendant.**


-----------------------------------------------------------x

### DECLARATION OF JASON SULTZER IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, LITIGATION COSTS, AND SERVICE AWARDS

### I.    INTRODUCTION

I, Jason Sultzer, submit this Declaration in support of Plaintiffs' Motion for Attorneys' Fees, Litigation Costs, and Service Awards, and affirm that the following is truthful and accurate:

1.    I am an attorney duly admitted before this Court. I am the founding partner at Sultzer & Lipari, PLLC and am one of the attorneys principally responsible for handling this case for Plaintiffs and the proposed Class.

2.    I am personally familiar with the facts set forth in this Declaration. If called as a witness, I could and would competently testify to the matters stated in this Declaration.

3.    On March 13, 2025, the Court granted Plaintiffs' Motion for Preliminary Approval of the Class Action Settlement in this action and granted related relief. ECF No. 34 (Preliminary Approval Order). In that Order, the Court conditionally designated me and seven other lawyers as Class Counsel for the Settlement Class. ECF No. 34 at ¶ 6. Those lawyers are:  Charles E.

Schaffer of Levin Sedran & Berman, Jeffrey Brown of Leeds Brown Law, P.C., Michael R. Reese of Reese LLP, Nick Suciu III of Milberg Coleman Bryson Phillips Grossman, PLLC, Paul Doolittle of Poulin Willey Anastapoulo, Joshua Arisohn of Bursor & Fisher, P.A., and Jeffrey S. Goldenberg of Goldenberg Schneider, LP.A. (collectively, Class Counsel"). Id.

4.     The proposed class action Settlement would resolve the economic claims of purchasers of Defendant Quaker's food products (the "Covered Products") for a non-reversionary common fund in the amount of $6,750,000 ("Settlement Fund"). Class Counsel achieved this proposed Settlement because of their experience in cases like this and because they invested considerable time, effort, and resources into prosecuting this case.  By any measure, Class Counsels' efforts have been an unqualified success, and the Class Members have responded in kind, with 140,712 Valid Claims submitted, a single objection (that Class Counsel is currently aware of), and only fifteen (15) valid requests for exclusion.

5.     Notably, the lone objection to the Settlement takes issue with certain procedural aspects of the claims process, but does not object to Class Counsel's requests for fees or incentive awards, or to the adequacy of the relief provided to the Class.  The fact that thus far no Class Members have objected to Class Counsel's fee request and expenses is strong evidence that the fee request is reasonable and appropriate. Moreover, the fact that there has been only one single objection (to other aspects of the Settlement) out of hundreds of thousands of class members is strong evidence of the fairness of a settlement.  Moreover, for reasons that Class Counsel will set forth in greater detail in their separate response to the objection, the objection is meritless.

6.     The Settlement Agreement provides that Defendant will establish a Settlement Fund in the amount of $6.75 million, which will be exhausted to pay all Valid Claims, as well as any attorneys' fees and costs, service awards, and notice and other administrative costs that are approved by the Court.  §1.33.  In addition, Class Counsel negotiated and Quaker agreed to pay

a $100,000 Initial Settlement Administration Payment to fund notice and administration costs that is separate and apart from the $6.75 million Settlement Fund. So, Quaker's aggregate monetary obligation for this Settlement is $6.85 million. § 4.1. Class Members who submit a Valid Claim that is not accompanied by Proof of Purchase shall receive the total of the average retail price for up to two (2) Covered Products claimed per household, with Quaker to provide the average retail prices of the Covered Products to the Class Administrator. §4.6.2. Class Members who submit a Valid Claim accompanied by Proof of Purchase of a Covered Product shall be entitled to receive a full refund of the amount of money he or she spent on the Covered Products that is documented by Proof of Purchase. §4.6.1. Each Settlement Class Member's payment shall be increased or decreased on a pro rata basis such that the total amount paid to all Settlement Class Members equals the Available Settlement Funds. § 4.6.4.1

7.      The Settlement also included significant non-monetary relief. Specifically, after the first Action in the Litigation was filed, Defendant made modifications to its practices and procedures regarding bacterial contamination and also expanded the Recall to include additional products that had the potential to be contaminated with Salmonella. Moreover, Defendant closed the plant that manufactured the recalled food and was a source of potential contamination. In addition, Defendant is continuing to diligently implement its food safety programs to reduce the potential future risk of bacterial contamination. § 4.14. These modifications significantly benefit consumers, including Settlement Class Members who wish to purchase Defendant's products in the future.

8.      The Settlement achieved by Class Counsel benefits Class Members in a number of ways.

---

[1] "Available Settlement Funds" means that the Settlement Fund net of any Notice and Administration costs, Service Awards and Attorneys' Fee and Expense Payment. § 1.3.

9.     First, besides putting money directly in their pockets, it has significantly expanded the scope of Defendant's recall/refund program.  Under the terms of the Settlement, Class Members with proof pf purchase receive the full purchase price of the Products they bought. Class Members without proof of purchase or the average price of the Products for up to two products. This is compensation that was not available through Defendant's recall of the Products at issue in the litigation, which required proof of purchase in order to receive reimbursement under certain circumstances.  Moreover, class members are getting well-above the average purchase price of the Covered Products of $6.92.  In addition, the comprehensive notice plan initiated by Class Counsel expanded on and reached a far greater number of consumers, resulting in 140,712 Valid Claims thus far, compared to the approximately $2.6 million in refunds distributed by Quaker as part of the Recall.

10.     Second, the Settlement benefits the entire Class as a whole, whether Class Members submitted a claim or not, because it provides for a high percentage of the total possible recovery in this litigation in the event the case was successfully tried to conclusion.  The total sales of the Products that are the subject of the litigation and which are potentially contaminated and potentially reached consumers' hands  during the relevant time period is approximately $27.6 million (using a 5% contamination rate, which is likely higher than the actual contamination rate based on Defendant's representations and Plaintiffs' own testing).  The $6.85 million recovery for the Class under the settlement represents approximately 25% of Defendant's potential liability under a disgorgement theory.  This alone is a very significant recovery, especially considering the difficulty in successfully litigating these types of cases, the risks of losing before or at trial, and how efficiently this Settlement was achieved.

11.     The full disgorgement theory would have been challenged by Defendant at trial and may not have succeeded, as Defendant likely would argue that even contaminated products

4

are not completely worthless. As a result, Plaintiffs' damage model may have been limited to the premium class members paid over what they would have paid had they known about the contamination or risk of contamination. This kind of "price-premium" damages analysis is widely accepted in consumer deception cases in this Circuit.

12.     Based on Class Counsel's experience in these kinds of consumer product contamination cases, as well as discussions with an economic expert who frequently uses conjoint analysis to calculate damages in similar cases, the best-case, price-premium scenario for products like this is generally around 30% of the purchase price. Here, the Settlement Class's best day under a 30% price premium model would be $9.2 million dollars, and the Settlement Agreement provides 74% of this value. Id. Thus, the class here is recovering somewhere between approximately 25% of what it might have recovered at trial (full disgorgement) and 74% of the price premium. Even on the low end, this is a significant recovery.

13.     Moreover, the Settlement provides significant non-monetary relief to the class as well. Specifically, after the first Action in the Litigation was filed, Defendant made modifications to its practices and procedures regarding bacterial contamination and also expanded the Recall to include additional products that had the potential to be contaminated with Salmonella. Moreover, Defendant closed the plant that manufactured the recalled food and was a source of potential contamination. In addition, Defendant is continuing to diligently implement its food safety programs to reduce the potential future risk of bacterial contamination. § 4.14. These modifications significantly benefit consumers, including Settlement Class Members who wish to purchase Defendant's products in the future.

14.     As set forth in section 7.1 of the Class Action Settlement Agreement, and paragraph 15 of the Preliminary Approval Order, Plaintiffs are now applying to the Court for an award of their Attorneys' Fees and Costs. Plaintiffs are applying for attorneys' fees and expenses

in the amount of one-third ($2,250,000) of the Settlement Fund and a service award of $500 for each Plaintiff, to be paid from the Settlement Fund.

15.    The reaction to the Settlement has been overwhelmingly favorable.

16.    There have been 140,712 Valid Claims filed and only a single objection to the Settlement has been filed, while there have been no objections to the requests for attorneys' fees, costs, or service awards. The Claims Administrator has received only fifteen (15) valid requests for exclusion.

## II.    BACKGROUND, PROCEDURAL HISTORY AND SETTLEMENT
### a.    Pre-Litigation Investigation, Litigation and Mediation

17.    On December 15, 2023, in coordination with the Food and Drug Administration, Defendant announced the recall of approximately ninety (90) Quaker products, mostly cereals and granola bars, due to the potential for contamination with Salmonella, a harmful bacterium.

18.    Before commencing the Litigation, Class Counsel extensively investigated and analyzed, among other things, Defendant's marketing campaign, the relevant FDA guidelines concerning labeling and advertising disclosure requirements for consumer products like the Quaker products at issue here, FDA and CDC guidelines regarding the presence of bacteria in consumer products, the scientific research concerning the dangers of bacteria (including Salmonella) , and research regarding how Defendant should have known the Products contained bacteria (including Salmonella).

19.    On or around December 27, 2023, Plaintiff Teresa Herendeen filed a Recall-related putative nationwide class action lawsuit against Quaker, captioned *Herendeen v. The Quaker Oats Company*, No. 1:23-cv-17103 (N.D. Ill.) asserting claims for negligence, breach of express warranty, breach of implied warranty of merchantability, fraudulent misrepresentation,

fraud by omission and unjust enrichment in connection with her alleged purchase of one or more recalled products

20.    On January 11, 2023, Defendant expanded its recall to include additional products.

21.    As part of its recall of the Covered Products, Defendant offered a full refund, in the form of coupons for Quaker products, to any consumer who submitted proof of purchase. To date, Quaker has issued refunds of approximately $2.6 million in connection with this recall in the form of coupons, cash, check and/or gift cards, all of which was paid to consumers following the initiation of this Litigation by Plaintiffs. Defendant has maintained that only a fraction of the Covered Products were actually contaminated (which Plaintiffs have verified though their own independent testing). In addition, the informal discovery Defendant provided to Plaintiffs demonstrates that a significant portion of the potentially contaminated Covered Products never made their way into the hands of consumers.

22.    On or about January 24, 2024, Plaintiff Kessler filed a Recall-related putative nationwide class action lawsuit against Quaker, captioned *Kessler v. The Quaker Oats Company*, No. 7:24-cv-00526 (S.D.N.Y.) asserting claims for violation of New York General Business Law Sections 349 and 350 in connection with his alleged purchase of one or more recalled products.

23.    On or about March 5, 2024, Plaintiff Hill filed Recall-related putative nationwide class action lawsuit against Quaker, which was subsequently removed to federal court, captioned *Hill v. The Quaker Oats Company*, No. 1:24-cv-02609 (N.D. Ill.), asserting claims for violation of the Connecticut Unfair Trade Practices Act, breach of implied warranty of merchantability and unjust enrichment in connection with her alleged purchase of one or more recalled products.

24.    On or about March 13, 2024, counsel Jeffrey S. Goldenberg sent Quaker a presuit notice letter threatening a Recall-related putative class action lawsuit on behalf of Plaintiff Lazaro Rodriguez, to be filed by Goldenberg Schneider, LPA and Levin Sedran & Berman, LLP,

7

asserting claims in connection with his alleged purchase of one or more recalled products.

25.    On or about April 9, 2024 counsel Jeffrey Brown informed Quaker that he had been retained to commence a Recall-related putative class action lawsuit on behalf of Plaintiff Barbara Abreu, to be filed by Leeds Brown Law, P.C, asserting claims in connection with her alleged purchase of one or more recalled products.

26.    Class Counsel took it upon themselves to self-organize and coordinate the actions so that all the cases would proceed before this Court, eliminating duplication for the parties and the Courts and limiting the expense to both sides.  This coordination also avoided a potentially lengthy leadership fight among counsel for Plaintiffs in the three actions.

27.    Throughout this Litigation, Class Counsel conducted significant legal research and investigated industry reports, scientific and epidemiological studies, and literature regarding the dangers of Salmonella and other bacteria, and the Covered Products' market segment, including as follows:

- Class Counsel thoroughly analyzed the legal landscape and evaluated the risks and benefits of prosecuting the Litigation, researching potential claims, state consumer protection laws, and available remedies, and evaluating class certification issues.

- Class Counsel analyzed Defendant's advertising campaigns and relevant regulations and guidelines concerning labeling and advertising disclosure requirements for consumer products, including other regulations and guidelines regarding the presence of hazardous and dangerous substances such as bacteria in consumer products.  Class Counsel reviewed scientific research and literature concerning the dangers of bacteria (including *Salmonella*) and investigated how Defendant should have known the Covered Products contained bacteria.

- Class Counsel consulted with industry experts regarding, *inter alia,* the presence of bacteria in consumer products, potential sources of bacteria in consumer products, and testing and screening for bacteria in consumer products.

- Class Counsel analyzed the chain of distribution and manufacturing process of the Covered Products, focusing on pricing per unit to formulate Plaintiffs' damages model.

- Class Counsel consulted with experts regarding potential damages models for consumers purchasing adulterated or misbranded products contaminated with bacteria.

- Class Counsel also analyzed Defendant's market segment related to the Covered Products to understand the potential scope of the economic losses to Class Members, and marketing and sales trends, practices, and patterns.

28.     Class Counsel also conducted testing of the products to determine the scope of potential contamination.

29.     Class Counsel has substantial experience prosecuting class actions and, in particular, class actions involving contaminated consumer products, including bacterial contamination and contamination by ingredients that were not supposed to be included in the products. *See Clinger v. Edgewell Personal Care Brands,* LLC, 3:21-cv-01040-JAM (D. Conn); *Catalano v. Lyons Magnus,* LLC, No. 7:22-cv-06867) (S.D.N.Y.) (Karas, J); *Patora v. Tarte, Inc.,* No. 18-cv-11760-KMK (S.D.N.Y.) (Karas, J.); *Rapoport-Hecht v. Seventh Generation*, No. 7:14-cv-09087 (S.D.N.Y.) *Mayhew, v. KAS Direct LLC*, No. 16-cv-6981-VB (S.D.N.Y.) (Karas, J.); *Swetz v. GSK Consumer Health, Inc*., No. 7:20-cv-04731-NSR (S.D.N.Y) (Roman, J); *Bangoura v. Beiersdorf, Inc. and Bayer Healthcare, LLC,* Case No. 1:22-cv-00291-BMC (E.D.N.Y.) (Cogan, J.); *Luib v. Henkel Consumer Goods Inc.*, No. 1:17-cv-03021-BMC (E.D.N.Y.) (Cogan, J.); *Vincent, Wesley, et al. v. People Against Dirty, PBC. and Method Products, PBC*., No. 7:16-cv-06936 (S.D.N.Y.) (Roman, J.); *Swetz v. The Clorox Company*, No. 7:22-cv-9374 (S.D.N.Y.) (Halpern, J.); *Patora v. Colgate-Palmolive Co.*, No. 7:23-cv-01118-VB (S.D.N.Y.) (Briccetti, J.).

30.     Before agreeing to resolve the claims in the Litigation, Class Counsel worked together to thoroughly analyze the legal landscape, including conducting research into the various state consumer protection laws and available remedies, Article III standing, preemption, and evaluating matters relating to class certification, in order to fully evaluate the risks and benefits to a potential early resolution.

31.     Indeed, Class Counsel worked cooperatively to coordinate the Litigation and to save judicial time and resources without a protracted battle for lead counsel and to lead the case to

mediation and an early resolution.

32.    As the parties' discussions progressed, they agreed to informally exchange information about the Class Products, the possible contamination of the Class Products, the sales information about the Class Products, the recall of the Class Products, and information about the scope of the claims and the possible damages at issue.  They agreed that an experienced mediator was necessary to guide the parties' settlement discussions about resolving the economic claims in this Litigation.

33.    Accordingly, the parties sought the assistance of the respected JAMS mediator and retired federal Magistrate Judge, the Honorable Jay C. Gandhi.

34.    In connection with the mediation, Class Counsel requested, and Defendant produced, critical discovery to enable Plaintiffs to evaluate their claims and position themselves to negotiate a settlement that would be fair and reasonable on behalf of the Settlement Class. This included additional information concerning the sales data of the Covered Products throughout the Class Period as well as Defendant's quality control and testing procedures regarding preservatives used in the Covered Products as well as bacterial contamination of the Covered Products.

35.    A full-day mediation session took place on April 11, 2024 with Judge Gandhi (Ret.) in California. At the mediation, the experienced counsel on both sides engaged in extensive arm's-length negotiations and were able to reach an agreement in principle to settle the economic claims on a class-wide basis by creating a non-reversionary $6,750,000.00 common fund.

36.    The Parties did not discuss Attorneys' Fees and Costs or any potential Incentive Award until they first agreed on the substantive terms of this Settlement.

37.    After the mediation the Parties continued to work diligently to negotiate and prepare the Settlement Agreement and other documents necessary to formalize the Settlement and present it to the Court for preliminary approval.

38.    On April 26, 2024, the Parties informed the Court that they had reached a resolution on the matter and requested permission to file a consolidated amended complaint and a motion for preliminary approval, which the Court granted. (Dkts. 7 & 8).

39.    On May 24, 2024, Plaintiffs filed a consolidated amended complaint for the purposes of settlement. (Dkt. 9).

40.    With respect to selecting a Settlement Administrator, before selecting Angeion Group ("Angeion"), Plaintiffs sought multiple bids from claims administrators and interviewed and vetted Angeion and its proposed notice plan for this Settlement.

41.     The parties selected Angeion based on its reputation for excellent work and its breadth of experience administering other similar consumer class actions, including its ability to prevent fraudulent claims and protect the integrity of the claims process.  For example, Angeion has administered similar class action settlements regarding consumer products.  *See Catalano v. Lyons Magnus, LLC*, Case No. 7:22-cv-06867) (S.D.N.Y.); *Bangoura v. Beiersdorf, Inc. et al*, 1:22-cv-00291-BMC (E.D.N.Y.) *Swetz v. The Clorox Company*, No. 7:22-cv-9374 (S.D.N.Y.); Patora v. Colgate-Palmolive Co., No. 7:23-cv-01118-VB (S.D.N.Y.).

42.    All parties executed the Settlement Agreement on or before June 24, 2024.

**b.  Summary of Settlement Benefits and Risks of Continued Litigation**

43.    Class Counsel has made a non-reversionary $6.75 million Settlement Fund available to Class Members, which will be exhausted to pay all Approved Claims, as well as any attorneys' Fee Award, expenses, Service Awards, and Notice and Other Administrative Costs that the Court approves. §1.33.  In addition, Class Counsel negotiated and Quaker agreed to pay a $100,000 Initial Settlement Administration Payment to fund notice and administration costs that is separate and apart from the $6.75 million Settlement Fund.  So, Quaker's aggregate monetary obligation for this Settlement is $6.85 million.  § 4.1.

44.     As discussed above, the Settlement provides significant value to the Class Members that was not available through Defendant's refund/recall program, resulting in a recovery of between 25% and 74% of Plaintiffs' estimated best potential recovery at trial.

45.     The value provided to Class Members is even more reasonable in light of the risks in this case.

46.     Although Plaintiffs are confident about their claims, Plaintiffs nonetheless face significant risks in establishing liability.

47.     If the Litigation were to continue, Plaintiffs would expect Defendant to continue to defend vigorously all aspects of Plaintiffs' claims, including on the class certification motion and the summary judgment motions.

48.     The outcome of these proceedings cannot be certain, and if the Litigation were to proceed to trial, it would be a lengthy and complex affair, with appeals likely to follow.

49.     Consistent with Second Circuit jurisprudence, in settling the Litigation, Plaintiffs accounted for the estimated damages, the benefits and risks of continuing litigation against Defendant, and the range of possible outcomes should the Litigation continue.

50.     Although Plaintiffs allege that Defendant sold millions of Covered Products during the Class Period, the damages calculation is inherently complex and subject to varying interpretations as discussed above.

51.     The Settlement also will provide an immediate and certain benefit to the Settlement Class and will avoid the substantial burdens, costs, and risks that continuing to litigate would impose on the parties, non-party witnesses, and the Court.  There would be long and expensive litigation between this stage of the case and any potential verdict.

52.     Even assuming arguendo, that continued litigation might result in a larger recovery than the Settlement, it would occur only after spending hundreds of thousands of dollars (or more)

that would deplete a significant portion of any increased recovery.

53.    Class Counsel undertook and litigated this case on a fully contingent basis. Class Counsel assumed a very real risk in taking on this contingent fee class action. Class Counsel has demonstrated that they were prepared to invest time, effort, and money over a period of years with absolutely no guarantee of any recovery. If this Action had continued to be litigated and Plaintiffs were ultimately unsuccessful in their claims, Class Counsel would not be entitled to recover any attorneys' fees or costs.

54.    Even if Plaintiffs could have defeated a motion to dismiss, obtained a class certification order and proceeded to trial, victory before the trier of fact would have been uncertain. Such uncertainty, moreover, was compounded by the appeals virtually certain to have followed any verdict. In short, while Class Counsel believes that the claims are viable and strong, there can be no denying the array of serious class-wide risks, any one of which could have precluded the Class and its counsel from recovering anything at all.

55.    By any standard, this Settlement constitutes a favorable result made possible by the dedication and skill of Class Counsel under very difficult circumstances.

56.    Moreover, Class Counsel are qualified, experienced, and generally able to conduct the Litigation. Class Counsel have invested considerable time and resources into prosecuting the Litigation and possess a long and proven track record of successfully prosecuting class actions, including false labeling cases, and numerous courts have appointed them as class counsel in other consumer class actions.

## III.    CLASS COUNSEL'S QUALIFICATIONS

57.    Class Counsel are some of the nation's preeminent and most experienced class-action firms with extensive experience in consumer protection, product liability, antitrust, securities, financial, commercial and other complex class-action litigation.

58.     Sultzer & Lipari has substantial experience with consumer class actions in general, and with consumer fraud and false advertising, specifically.  I have prosecuted, and been appointed as lead counsel in, numerous consumer fraud class action cases throughout the country, including in several cases before Your Honor, in which I have recovered millions of dollars and obtained injunctive relief on behalf of consumers. My significant experience representing consumers in class action litigation is detailed more fully in my firm resume which can be found at ECF No. 13-3.

59.     The other members of Class Counsel are similarly experienced as set forth in their accompanying firm resumes.  See ECF Nos. 13-4 through 13-10.

60.     In the process of handling these cases, Class Counsel has devoted an extensive amount of time to investigating, litigating, settling, and administering these class actions.

## IV.     SUMMARY OF CLASS COUNSEL'S SIGNIFICANT WORK AND UNREIMBURSED LITIGATION EXPENSES

61.     From the inception of this case to the present, Class Counsel vigorously investigated and pursued this litigation, committing their services and resources and advancing funds out-of-pocket to prosecute it for the Plaintiffs and the proposed Class. Class Counsel provided these services and advanced necessary litigation expenses with no assurance of compensation or repayment and have received no compensation or reimbursement of their expenses. Class Counsel's compensation and expense reimbursement has at all times in this litigation been entirely contingent upon successfully obtaining relief.

62.     In December 2023, when Quaker announced the possible contamination of its products, Class Counsel started investigating the contamination and Quaker's corresponding false and misleading advertising.  Class Counsel reviewed, inter alia, publicly available documents about Quaker's products, the recall, and Salmonella, and  researched claims and federal regulations

governing limits for contaminants like bacteria. They also interviewed and conferred with experts pertaining to sourcing of ingredients, testing/screening for bacteria, and economic damages models, and conferred with other counsel in advance of filing the first complaint in these cases. They also interviewed numerous consumers who had purchased the Covered Products.

63.     Class Counsel diligently, skillfully and efficiently investigated and prosecuted this litigation from its inception in the face of skilled, professional and determined opposition from Defendant and its capable counsel. These efforts required researching and arguing complex legal and factual issues, and numerous meetings, extensive negotiations and other communications with defense counsel and third parties.

64.     More specifically, Class Counsel's efforts on behalf of the Settlement Class included the following:

a)   investigating the underlying factual background regarding the contamination of the Covered Products with bacteria, including *Salmonella* researching industry standards regarding sourcing of ingredients, screening and testing for bacteria, interviewing industry and supply experts regarding sourcing of ingredients for the products as well as preservatives to use to  protect against bacterial contamination, and developing legal theories of the case regarding the misbranding and adulteration of the products;

b)   investigating and researching the applicable legal standards for product defect cases involving products such as the Covered Products;

c)   vetting and working with experts in the field of consumer products, including sourcing of ingredients, as well as screening and testing for bacteria;

d)   vetting and working with experts in the fields of economics and determining economic loss on a class-wide basis in consumer class actions;

e)   drafting the complaints and amended complaints;

f)   conducting legal research and analysis regarding the claims asserted buy Plaintiffs as well as certification of consumer claims on a national basis and statewide basis;

g)   conducting informal (*i.e.* settlement) discovery pre-and post-mediation;

h) legal research related to defendant's potential defenses;

i) participating in case strategy decisions and discussions with other Class Counsel;

j) conducting numerous arms–length, independent settlement negotiations with the JAMS mediator, Magistrate Gandhi (Ret.);

k) drafting the settlement agreement along with the requisite exhibits, including claim forms, content of settlement webpage, opt out forms, long and short form notice forms, and other related documents;

l) researching and selecting the claims administrator (Angeion) and implementing the notice program;

m) developing and implementing the notice plan with claims administrator/notice provider Angeion;

n) working with Angeion to prepare and send notice of the Settlement to putative Settlement Class Members, respond to inquiries from Settlement Class Members and others, and supervise the claims administration process;

o) troubleshooting the claims process in conjunction with defendant's counsel and claims administrator/notice provider Angeion;

p) speaking with class members who contacted class counsel regarding filing of claim forms; and

q) preparing and drafting the motion for preliminary approval of the Settlement.

65.    The chart below details the hours billed and the amount billed at current rates through July 14, 2025 for Sulzer & Lipari attorneys:

| Attorney | Total Hours | Hourly Rate | Amount |
|---|---|---|---|
| Jason Sultzer | 394.96 | $900 | $355,464.00 |
| Jeremy Francis | 80.70 | $875 | $70,612.50 |
| Daniel Markowitz | 28.6 | $875 | $25,025.00 |
| Philip Furia | 13.6 | $875 | $11,900.00 |
| Total: | 517.86 | | $463,001.50 |

66.    During the course of this case, Sulzer & Lipari incurred $41,240.41 in

unreimbursed expenses.[2] These expenses were reasonably and necessarily incurred in connection with the prosecution of this litigation. These expenses are reflected in the books and records of Sultzer & Lipari and are a true and accurate summary of the expenses for this case. The chart below details the expenses incurred by category:

| CATEGORY | EXPENSE AMOUNT |
|---|---|
| Preliminary Approval Transcript Fee | $40.60 |
| Expert Fees/Testing | $27,600.00 |
| Investigation/Consultant Fees | $8,000.00 |
| Travel | $5,599.81 |
| **TOTAL** | **$41,240.41** |

67.     Further, our work on this litigation has not ended and will not end until the last settlement distribution payment is made to eligible Settlement Class Members. We expect to expend additional hours going forward, which of course are not included in Class Counsel's lodestar reported below, concerning the Settlement approval and administration processes, potential appeals, preparing for the Final Approval Hearing, responding to Settlement Class Members and other inquiries and, if the Court grants final approval, overseeing Settlement administration.

68.     The work performed by Class Counsel is set forth in the declarations from each firm accompanying Plaintiffs' motion.

69.     The chart below details the hours billed and the amount billed at current rates through July 14, 2025 for Class Counsel (each of whom submits a supporting fee declaration with this motion):

| Attorney | Total Hours | Lodestar |
|---|---|---|
| **Sultzer & Lipari, PLLC** | 517.86 | $463,001.50 |
| **Levin Sedran & Berman** | 188.9 | $193,622.50 |
| **Leeds Brown Law, P.C.** | 326.5 | $392,452.50 |

---

[2] Class Counsels' expenses are not being separately taken out of the Settlement Fund that provides relief to the Class Members, but rather are included in the request for Attorneys' Fees.

| Attorney | Total Hours | Lodestar |
|---|---|---|
| Reese LLP | 188.3 | $305,987.50 |
| Milberg Coleman Bryson Phillips Grossman, PLLC | 72.20 | $64,074.10 |
| Poulin Willey Anastapoulo | 107.83 | $53,445.31 |
| Bursor & Fisher, P.A. | 34.2 | $23,830.50 |
| Goldenberg Schneider, L.P.A. | 49.7 | $38,892.50 |
| **Total:** | **1,485.49** | **$1,535,306.41** |

70.     This summary was prepared from contemporaneous, daily time records regularly prepared and maintained by Class Counsel.

71.     As set forth in the accompanying fee declarations, the detailed descriptions of the time spent by the attorneys and other professionals at Class Counsel's firms in this litigation was prepared from contemporaneous, daily time records prepared and maintained by each firm. The lodestar figure is based on the ordinary professional billing rates that Class Counsel charges clients in class action litigation . Expenses are accounted for and billed separately, without markup, and are not duplicated in the professional billing rates. Further details regarding the litigation and trial experience of each professional can be found, to the extent available, in accompanying fee declarations and the firm resumes.

72.     The hourly rates shown in the accompanying fee declarations are the usual and customary lodestar rates charged in the Southern District of New York, and the national venues in which the firms typically handle cases for each individual doing the type of work performed in this litigation. These rates were not adjusted, notwithstanding the complexity of this litigation, the skill and tenacity of the opposition, the preclusion of other employment, the delay in payment, or any other factors that could be used to justify higher hourly compensation. The rates reflect Class Counsel's experience in the field and the complexity of the matters involved in this litigation and

have not been adjusted.

73.    Moreover, Class Counsel made every effort to work efficiently and minimize the number of billing attorneys within each firm.

74.    I believe that the time reflected in Class Counsel's lodestar calculation and the expenses for which payment is sought are reasonable in amount and were necessary for the effective and efficient prosecution and resolution of this litigation.

75.    The lodestar summary reflects Class Counsel's experience in the field, the complexity of the matters involved in this litigation, and the prevailing rate for providing such services.

76.    The number of hours that Class Counsel has devoted to pursuing this litigation is reasonable and appropriate, considering, among other factors: (a) the scope and high stake's nature of this proceeding; and b) the novelty and complexity of the claims asserted in the litigation.

77.    From the inception of this matter through July 14, 2025, Class Counsel expended 1,485.49 hours prosecuting this litigation, resulting in a total lodestar of $1,535,306.41 ($1,607,309.82 when Class Counsel's $72,003.41 in expenses are added).

78.    As of today, the requested total attorney fee amounts to a modest multiplier of approximately 1.4. That multiplier is further justified by the significant non-monetary relief achieved on behalf of the Class. Notably, Class Counsel will continue to spend time and resources overseeing the Settlement administration, assisting Class Members, and tending to any other issues that may arise related to the Settlement. Accordingly, Class Counsel's lodestar multiplier will decrease as they continue to work on the litigation in advance of the final approval hearing in August 2025.

79.    The requested fee is in line with the fee range commonly granted in other class action cases in the Second Circuit and elsewhere as discussed more fully in Plaintiffs'

accompanying Memorandum of Law in support of their request for attorneys' fees.

80.     During the course of this case, Class Counsel incurred $72,003.41 in unreimbursed expenses.     These expenses were reasonably and necessarily incurred in connection with prosecuting this litigation.  These expenses are reflected in the books and records of Class Counsel and are a true and accurate summary of the expenses for this case as detailed in the accompanying declarations from Class Counsel. The chart below details the expenses incurred by category:

| CATEGORY | EXPENSE AMOUNT |
|---|---|
| Computer Research | $4,535.73 |
| Filing fees | $1,605.50 |
| Postage/Overnight Delivery | $17.08 |
| Notary Public | $5.00 |
| Travel | $14,365.65 |
| Photocopy | $4.05 |
| Expert/Testing Fees | $27,640.60 |
| Investigation/Consultant Fees | $8,000.00 |
| JAMS (Mediation) | $15,500.00 |
| Service of Process | $38.00 |
| Administrative Costs | $150.00 |
| Transcript Fees | $142.80 |
| **TOTAL** | **$72,003.41** |

## V.     SERVICE AWARDS

81.     Class Counsel requests a service award of $500 for the Class Representative Plaintiffs.  The named Plaintiffs were subjected to an extensive vetting interview. The named plaintiffs also provided information to substantiate the purchased products. The plaintiffs took on the responsibilities of a class representative, and were willing to be deposed, provide discovery, and testify at trial.

## VI.     CONCLUSION

82.     For the reasons set forth in this declaration, Class Counsel respectfully requests that the Court grant Plaintiffs' Motion for an award of Attorneys' Fees, Expenses and Service Awards

for Class Representative Plaintiffs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of July 2025 in Poughkeepsie, New York.

/s/ Jason Sultzer
Jason Sultzer